IN THE COMMONWEALTH COURT OF PENNSYLVANIA.

Howard Podejko, Myrtis Podejko :
and Myrtis's Preschool and Creative :
Learning Center, :
     Appellants :
         :
    v.     :
         :
Department of Transportation of the :
Commonwealth of Pennsylvania, :
Texas Township, and The White Mills :
Fire Department :
         :
    v.     :
         :
Hertha M. Kastler, Executrix of The : No. 714 C.D. 2019
Estate of Joseph G. Bunnell : Argued: May 13, 2020

BEFORE: HONORABLE MARY HANNAH LEAVITT, President Judge
     HONORABLE RENÉE COHN JUBELIRER, Judge
     HONORABLE P. KEVIN BROBSON, Judge
     HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE ANNE E. COVEY, Judge
     HONORABLE ELLEN CEISLER, Judge
     HONORABLE J. ANDREW CROMPTON, Judge

OPINION BY
JUDGE COVEY        FILED: July 27, 2020

Howard Podejko, Myrtis Podejko (collectively, the Podejkos) and Myrtis's Preschool and Creative Learning Center (Preschool) appeal from the Wayne County Common Pleas Court's (trial court) February 6, 2019 order granting summary judgment in favor of the White Mills Fire Department (Fire Department) and dismissing the Podejkos' Complaint against the Department of Transportation (DOT), Texas Township (Township), and the Fire Department for damages to the Preschool (Complaint). The sole issue for this Court's review is whether the trial court erred as

a matter of law by concluding that the Fire Department's 32 Mini Pumper Truck (Pumper Truck) was not *in operation* for purposes of the vehicle liability exception (Vehicle Liability Exception) to what is commonly referred to as the Political Subdivision Tort Claims Act (Tort Claims Act).[1]

The Podejkos own and operate the Preschool at 523 Old Willow Avenue, in Honesdale, Pennsylvania (Property), which is located at the bottom of a steep embankment from State Route 6 (Route 6/Grandview Avenue) in the Township. Route 6 flooded in the late afternoon of July 31, 2016, and again during the overnight hours between August 1 and 2, 2016. Reproduced Record (R.R.) at 22a-25a. The Fire Department was called to pump the water from the roadway. The Podejkos asserted that, on both days, "[t]o alleviate the flooding, [the Fire Department] pumped water located on [Route 6] in the vicinity of [the Property] and then shot that water into [a shopping plaza (Plaza)] parking lot located at 250 Grandview Avenue . . . and over the embankment onto [the Property]." R.R. at 15a. They claimed: "The diverting of flood water onto [the Property] on July 31[], August 1, [] and August 2, 2016 caused substantial damage to [the Property], destroying the playground and flooding two rooms in the [Preschool]." R.R. at 16a; *see also* R.R. at 60a.

On April 25, 2017, the Podejkos filed the Complaint, averring therein that DOT caused Route 6 to flood by negligently failing to clean the storm water drains on the berm adjacent to Route 6 (*see* R.R. at 18a-19a),[2] that the Fire Department negligently removed the water from Route 6 (*see* R.R. at 19a-20a), and that the Township negligently failed to properly supervise the Fire Department (*see* R.R. at 20a-21a). The Podejkos maintain that the Fire Department's actions fall within the Vehicle Liability Exception to governmental immunity. *See* R.R. at 20a.

---

[1] 42 Pa.C.S. §§ 8541-8542.

[2] DOT owns and maintains Route 6.

DOT, the Township and the Fire Department each filed an answer, new matter and crossclaim, with the Fire Department raising, *inter alia*, the affirmative defense of governmental immunity. *See* R.R. at 33a-39a. DOT joined the Estate of Joseph G. Bunnell (Estate) as an additional defendant, alleging that runoff from the quarry operated by the late Mr. Bunnell caused the storm water drain clogs in the first instance. After the pleadings closed, the parties voluntarily dismissed the Township from the action.

The Fire Department admitted that it pumped the water into the Plaza parking lot for approximately 45 minutes on July 31, 2016, and for approximately an hour overnight between August 1 and 2, 2016, but clarified that the water went into two separate Plaza drains, and that the Fire Department did not pump water over the embankment onto the Podejkos' Property. *See* R.R. at 22a-25a, 33a-39a, 43a. The Fire Department claimed that it dispensed the water near the Plaza entrance closest to Honesdale, a significant distance from the Property. *See* R.R. at 45a.

During discovery, a Fire Department firefighter who was at the scene on July 31, 2016, testified that the Fire Department operated the Pumper Truck for approximately 45 minutes to clear the water that "was almost over the guardrails." R.R. at 124a. The firefighter explained that a fan in the front of the Pumper Truck created suction that pulled water in through a suction hose, and simultaneously discharged the water from the Pumper Truck's rear, where the firefighters observed it go into the Plaza drains. During this time, the Pumper Truck's engine was running, but the Pumper Truck was stationary, except for when the firefighters moved it approximately five to ten feet to get further into the water. *See* R.R. at 126a-127a. The Fire Department used the same Pumper Truck and a similar process on August 1 and 2, 2016. The Podejkos did not observe the Fire Department shoot water over the embankment onto the Property. *See* R.R. at 50a, 76a-77a, 80a, 82a. Their only purported evidence that the Fire Department shot water over the embankment onto

3

their Property was Howard Podejko's hearsay testimony that Plaza business owners told him that is what occurred. *See* R.R. at 49a-50a, 82a-83a, 104a-105a.

On November 1, 2018, the Fire Department filed a motion for summary judgment (Motion). *See* R.R. at 42a-46a. In the Motion, the Fire Department stated:

> 19. On October 31, 2018, the [Podejkos] produced an expert liability report prepare[d] by Michael J. Tuttman, P.E. [(Tuttman).] A copy of that report is attached as Exhibit D.
>
> 20. Per this report, the [Podejkos] are now adding a new theory of liability against the [Fire Department].
>
> 21. In his report, [] Tuttman opines as follows:
>
>> The failure of the [Fire Department] to determine where [its] discharged pumped water would outlet, and subsequently flow, created an unreasonable condition which was a cause of the Preschool flooding and the resulting building damage.
>>
>> The failure of the Fire Department to adequately observe the entire Plaza led to the [c]atch [b]asin above the Preschool (CB-PO4) overflowing unnoticed. Had the [P]roperty been properly monitored, the basin observed to be overflowing in a timely manner, damage to the Preschool could have been avoided or minimized. *See* pages 13-14 of Tuttman report, attached as [Motion] Exhibit D [(*see* R.R. at 99a-100a)].
>
> 22. This new theory of liability does not fall into any of the exceptions to immunity.

Motion at 4-5 (R.R. at 45a-46a). The Podejkos opposed the Motion, again asserting that the Fire Department was liable because the Vehicle Liability Exception to governmental immunity applied. *See* R.R. at 108a. In their response, the Podejkos stated: "[R]egardless of which side of the [Plaza] parking lot water was pumped into, the failure of [the] Fire Department to determine where the water it discharged would outlet, and its further failure to adequately observe the entire [P]laza property to

4

detect the overflowing and flooding, likely led to the overflowing of the catch basin, causing the flooding to [the Podejkos'] [P]roperty, as opined by [the Podejkos'] engineering expert." Podejko Answer to Motion at 5 (R.R. at 106a).

On February 6, 2019, the trial court granted the Motion and dismissed the Complaint against the Fire Department with prejudice. The trial court rejected the Podejkos' assertion that the Vehicle Liability Exception applied, reasoning that pumping water from a fire truck does not require any decisions related to transporting an individual from one place to another. *See* Podejko Br. App. A. The Podejkos filed a motion for reconsideration with the trial court, which the trial court denied. *See* R.R. at 10a, 141a-144a. Thereafter, the Podejkos settled, discontinued and ended their action against DOT and the Estate, leaving the Fire Department as the sole remaining defendant. *See* R.R. at 10a. The Podejkos appealed to this Court.[3]

On June 14, 2019, the trial court issued an order pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(b), directing the Podejkos to file a Concise Statement of Errors Complained of on Appeal (1925(b) Statement)

_____

[3] The law is well settled:

> An order of a trial court granting summary judgment may be disturbed by an appellate court only if the court committed an error of law; thus, our standard of review is *de novo,* and our scope of review is plenary. The entry of summary judgment is proper whenever no genuine issue of any material fact exists as to a necessary element of the cause of action. The moving party's right to summary judgment must be clear and free from doubt. We examine the record, which consists of all pleadings, as well as any depositions, answers to interrogatories, admissions, affidavits, and expert reports, in a light most favorable to the non-moving party, and we resolve all doubts as to the existence of a genuine issue of material fact against the moving party.

*Moon v. Dauphin Cty.*, 129 A.3d 16, 19 n.3 (Pa. Cmwlth. 2015) (quoting *LJL Transp., Inc. v. Pilot Air Freight Corp.,* 962 A.2d 639, 647 (Pa. 2009) (citations omitted)).

On July 17, 2019, the Office of Attorney General notified this Court that it would not participate in this appeal.

within 21 days (Rule 1925(b) Order). *See* R.R. at 145a. The trial court's docket entries reflect that the order was served on the Podejkos on June 17, 2019. *See* R.R. at 11a. On August 6, 2019,[4] the trial court issued a Statement of Reasons, wherein it held: "[The Podejkos] ha[ve] failed to comply with this [trial c]ourt's Rule 1925(b) Order. Accordingly, this [trial c]ourt respectfully requests the Commonwealth Court to consider [the Podejkos'] failure to comply as a waiver of all objections to this Court's February 6, 2019 Opinion and Order."[5] R.R. at 147a.

By August 9, 2019 Order, this Court directed: "[T]he parties shall address in their principal briefs on the merits or other appropriate motion whether [the Podejkos] preserved any issues on appeal in light of their apparent failure to file [the Rule 1925(b)] Statement as directed by the trial court." August 9, 2019 Order. It appears that, upon receipt of this Court's August 9, 2019 Order, the Podejkos filed their Rule 1925(b) Statement. *See* Podejko Br. App. B. The trial court then filed a supplemental record with this Court, which included the Podejkos' Rule 1925(b) Statement. In a footnote contained in the Podejkos' Rule 1925(b) Statement, the Podejkos claimed that their counsel was not served with the trial court's Rule 1925(b) Order. *See* Podejko Br. App. B-1 n.1.

By August 14, 2019 Order, this Court vacated its August 9, 2019 Order and remanded the matter to the trial court for a determination of whether the Rule 1925(b) Order was served on the Podejkos' counsel, and a supplemental opinion, if necessary.[6] Thereafter, this Court learned that, on August 8, 2019, the trial court

---

[4] The trial court issued an order on August 5, 2019 for "the Superior Court" to consider the Podejkos' failure to comply with its 1925(b) Order a waiver. R.R. at 146a. The trial court filed a corrected order on August 6, 2019, referring to "the Commonwealth Court." R.R. at 147a.

[5] On August 6, 2019, the trial court issued notice to the parties that it had transmitted the record to this Court. *See* R.R. at 11a.

[6] In the interim, on August 13, 2019, the Podejkos filed in this Court a designation of the parts of the record it intended to produce and a Brief Statement of Issues the Podejkos Intend to Present for Review.

issued a Statement of Reasons wherein the trial court explained that its docket entries did not show entry of the trial court's Rule 1925(b) Order and, since there was no evidence that the Rule 1925(b) Order was mailed to the Podejkos, the Podejkos did not waive any issues on appeal. *See* Podejko Br. App. C.

> Initially,
>
> [t]he [Tort Claims Act] provides the defense of governmental immunity against any damages resulting from injury to a person or property caused by any act of a local agency or its employee. 42 Pa.C.S. § 8541[.] This governmental immunity, however, is not absolute. Section 8542 of the Judicial Code provides that an injured party may recover in tort from a local agency if (1) damages would be otherwise recoverable under common law or statute; (2) the injury was caused by the negligent act of the local agency or an employee acting within the scope of his official duties; and (3) the negligent act of the local agency falls within one of eight enumerated categories. *Id.* [(]citing 42 Pa.C.S. § 8542(a)[)]. One of the enumerated exceptions to the general grant of immunity is the 'vehicle exception' for acts involving the 'operation of any motor vehicle in the possession or control of the local agency . . . .' 42 Pa.C.S. § 8542(b)(1).

*N. Sewickley Twp. v. LaValle*, 786 A.2d 325, 327 (Pa. Cmwlth. 2001) (citations omitted). More specifically, Section 8542(b)(1) of the Tort Claims Act states, in relevant part:

> The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:
>
> *Vehicle liability.*--**The operation of any motor vehicle** in the possession or control of the local agency . . . . As used in this paragraph, 'motor vehicle' means any vehicle which is self-propelled **and any attachment thereto**, including vehicles operated by rail, through water or in the air.

42 Pa.C.S. § 8542(b)(1) (emphasis added).  "Finally, in interpreting the [Tort Claims] Act, exceptions to governmental immunity must be narrowly construed." *Brewington for Brewington v. City of Phila.*, 199 A.3d 348, 355 (Pa. 2018).

The Podejkos argue that the trial court erred as a matter of law by granting the Motion based on its conclusion that the Vehicle Liability Exception does not apply.  They specifically assert that the trial court erroneously interpreted *in operation* as requiring one or more decisions relating to transporting individuals from one place to another, which added a requirement the General Assembly did not intend.  The Fire Department responds that, since its removing of the water from Route 6 with the Pumper Truck and pumping it into the Plaza drains on July 31 and August 1 and 2, 2016 did not constitute *operation of a vehicle*, its actions did not come within the Vehicle Liability Exception.

The Tort Claims Act does not define *operation*.  However, Pennsylvania courts have defined the term.  We begin our analysis by reviewing the development of that definition.  The Pennsylvania Supreme Court significantly analyzed the meaning of *operation* in *Love v. City of Philadelphia,* 543 A.2d 531 (Pa. 1988).[7] Therein, Catherine Love, an elderly, partially-blind woman was injured after she fell while exiting a city-owned van.  Usually, the driver parked the van at the curb in front of her home, placed a portable step at the van doors and helped her alight from the van.  However, on the date she was injured, she apparently exited the van before the driver could assist her, and she fell.  The city claimed immunity.  After a bench trial, the trial court concluded that the driver's negligence caused Love's injuries, and that the action came within the Vehicle Liability Exception to the Tort Claims Act, thereby making the city liable.  On appeal, this Court reversed, ruling that the Vehicle Liability Exception did not apply and, thus, the city was immune from liability.  On

---

[7] The Pennsylvania Supreme Court overruled *Love* in *Balentine v. Chester Water Authority*, 191 A.3d 799 (Pa. 2018).

further appeal, after analyzing dictionary definitions and the Pennsylvania No-Fault Act,[8] the Pennsylvania Supreme Court affirmed this Court's Order, reasoning:

> [T]o operate something means to actually put it in motion. Merely preparing to operate a vehicle, or acts taken at the cessation of operating a vehicle are *not* the same as actually operating that vehicle. Thus, according to the common and approved usage of the word 'operation', the van was not in operation at the time of [Love's] accident. Getting into or alighting from a vehicle are merely acts ancillary to the actual operation of that vehicle.

*Love*, 543 A.2d at 533. Notably, Justice Nicholas P. Papadakos dissented, opining:

> Under the majority's interpretation, one can only be operating a vehicle if he actually puts it in motion or drives it. If the legislature so intended, I am sure it is capable of making such a distinction by using the appropriate language. **The legislature used the term operation of a vehicle and this includes conduct which is generally within the intended use of the vehicle and entails the use of the vehicles appurtenant parts**. . . .
>
> Moreover, the term operation cannot be construed without regard to the facts of this case and the duties of the operator with respect to the vehicle and [Love].

*Love*, 543 A.2d at 534 (Papadakos, J., dissenting) (emphasis added).

In subsequent cases, this Court held that *operation* meant movement of the vehicle. *See Pa. State Police v. Robinson*, 554 A.2d 172 (Pa. Cmwlth. 1989)[9] (the State Police was from immune from suit because the state trooper's vehicle from which Robinson was retrieving flares was not in motion when Robinson was struck by another vehicle); *Cacchione v. Wieczorek*, 674 A.2d 773 (Pa. Cmwlth. 1996) (operation of a vehicle ends when the vehicle is properly parked); *Beitler v. City of Philadelphia*, 738 A.2d 37 (Pa. Cmwlth. 1999) (vehicle operation ended when an

---

[8] Act of July 19, 1984, P.L. 489, *as amended*, *formerly* 40 P.S. §§ 1009.101-1009.701, repealed by the Act of February 12, 1984, P.L. 26.

[9] Abrogated by *Balentine*.

officer temporarily stopped to assist a motorist, because the subsequent assisting of the motorist was a police duty distinct from operating the vehicle).

In *Warrick v. Pro Cor Ambulance, Inc.*, 709 A.2d 422 (Pa. Cmwlth. 1997), *aff'd*, 739 A.2d 127 (Pa. 1999), this Court further clarified the definition of *operation*. In *Warrick*, a Southeastern Pennsylvania Transportation Authority (SEPTA) bus driver discharged two school students at an intersection, rather than at their designated stop at the middle of the block. When the children crossed into the street in front of the bus, they were struck by an ambulance that illegally passed the bus and killed one of the children. The child's estate sued the parties involved. SEPTA filed a summary judgment motion based on the Vehicle Liability Exception, and the trial court granted the motion. On appeal, this Court affirmed SEPTA's immunity, because the child was not injured by the bus or any moving part of the bus, stating:

> [A] temporary stop connected to the discharge of passengers is not part and parcel of the operation of a vehicle. Pennsylvania caselaw limits injuries caused by the operation of a vehicle to those injuries resulting from the actual movement of the vehicle or a moving part of the vehicle.
>
> . . . . [T]o hold that the mere opening of the doors to drop off a passenger amounts to the type of communication that could lead to the imposition of liability in sovereign immunity cases would be an unwarranted expansion of the motor vehicle exception.

*Warrick*, 709 A.2d at 427 (citations omitted). Although the Supreme Court affirmed this Court's Order on appeal, Justice Sandra Schultz Newman dissented, opining that the Commonwealth Court applied the Vehicle Liability Exception too narrowly. Justice Newman declared:

> **[I]t is impossible to look at the term 'operation' of a motor vehicle in a vacuum and ignore the purpose for**

**which the vehicle is operated**, particularly where, as here, the sovereign is acting as a common carrier in the operation of its vehicle. In this case, SEPTA serviced a specific bus route, which regularly transported school children to and from school. The public, especially children, put their trust in the driver of a common carrier to stop at the designated stop, and not at a dangerous location. They assume that the driver will not let them off the bus in a place where approaching traffic can not see them.

. . . . The process of operating a vehicle encompasses more than simply moving the vehicle. When a person 'operates' a vehicle, he makes a series of decisions and actions, taken together, which transport the individual from one place to another. The decisions of where and whether to park, where and whether to turn, whether to engage brake lights, whether to use appropriate signals, whether to turn lights on or off, and the like, are all part of the 'operation' of a vehicle.

. . . .

The term 'operation' reflects a continuum of activity, the boundaries of which this Court should define. 'Operation' does not mean simply moving forward or backwards, but instead includes the decision making process that is attendant to moving the vehicle. Had the legislature intended that recovery was permissible only when the vehicle was actually in motion, the legislature would not have used a word that implies a process, such as the term 'operation.' Moreover, the term 'operation' of a motor vehicle occurs in other statutory provisions and in those cases, we have not required that the term 'operation' means that the automobile actually be in motion.

. . . .

. . . . Here, I believe that the act and the decision of where to discharge the passengers, including this small child, constitute **an integral component to the 'operation'** of the SEPTA bus. . . . In reaching this conclusion, I find persuasive the Third Circuit's statement in *Toombs v. Manning,* 835 F.2d 453, 468 (3[]d Cir. 1987) (en banc) that, '**the operation of a** SEPTA **vehicle cannot be divorced from the purposes of the vehicle's operation**.' The *Toombs* court rejected the rigid analysis that a vehicle is

11

operated only where it is in motion and determined that, when applied to a common carrier, the term 'operation' covered the discharge of passengers from a subway car. I would adopt a similar analysis as set forth above. This result is also consistent with a recent decision of this Court recognizing that the plain language of the motor vehicle exception encompasses negligent acts related to the operation of a vehicle. *See Mickle v. City of Phila*[.], . . . 707 A.2d 1124 ([Pa.] 1998) ([the c]ity not immune where plaintiff was injured while riding in a [c]ity-owned vehicle due to negligent maintenance of the vehicle).

*Warrick*, 739 A.2d at 128-29 (Newman, J., dissenting) (citations and emphasis omitted; emphasis added).

Thereafter, this Court reviewed the prior *operation* cases in *North Sewickley Township* and held:

These cases can be synthesized to generalize that operation of a vehicle requires movement of the vehicle and when the vehicle is not moving, it is generally not considered to be in 'operation' under the vehicle exception. *Cf. Vogel v. Langer,* . . . 569 A.2d 1047 ([Pa. Cmwlth.] 1990) (momentary stop in traffic was ancillary to operation of bus and, therefore, bus was in operation). **Where an act, however, causing movement of a *part of a vehicle* is directly connected with the injury at issue, this Court has found the [V]ehicle [Liability] [E]xception to be applicable**. *See*[,] *e.g., Sonnenberg v. Erie Metro*[.] *Transit Auth*[.]*,* . . . 586 A.2d 1026, 1028 ([Pa. Cmwlth.] 1991) (injury by the physical closing of a bus door when the bus was stationary). In the matter *sub judice*, neither the vehicle nor a part of the vehicle was moving.

*N. Sewickley Twp.*, 786 A.2d at 328 (emphasis added).

Most recently, in *Balentine v. Chester Water Authority*, 191 A.3d 799 (Pa. 2018), the Pennsylvania Supreme Court established an expanded definition of *operation.* Therein, a water authority (authority) employee approached a roadside job site where another company (company) was working on the water main, parked the authority's vehicle approximately 80% in the roadway, activated the vehicle's four-

way flashers and amber strobe light, and exited the vehicle. A company employee was working in a ditch between the sidewalk and the curb of the road approximately 10 to 15 feet from the where the authority vehicle was parked. When another vehicle hit the authority vehicle, the authority vehicle struck and killed the company worker. The deceased company worker's estate brought a negligence action against the authority. The authority filed a summary judgment motion based on governmental immunity. The trial court granted the motion, holding that the Vehicle Liability Exception did not apply and, thus, the authority was immune from suit. On appeal, a divided panel of this Court affirmed the trial court's decision, holding "that involuntary movement of a vehicle does not constitute 'operation' for purposes of the [][V]ehicle [Liability] [E]xception to governmental immunity." *Id*. at 803.

On appeal from this Court's decision in *Balentine*, the Pennsylvania Supreme Court recognized: "Inherent in whether the Commonwealth Court erred by holding that involuntary movement does not constitute operation of a motor vehicle, lies the more fundamental question regarding the relationship between motion and operation[,]" *id*. at 808, as addressed by Justice Papadakos in his *Love* dissent, and as Justice Newman elaborated in her *Warrick* dissent. The Pennsylvania Supreme Court in *Balentine* adopted Justice Newman's continuum of activity definition from *Warrick*, stating that it "creates a reasonable standard that comports with the intent of the General Assembly and avoids the illogical results that have flowed from the emphasis on motion in *Love* and its progeny." *Id*. at 810. Based thereon, the *Balentine* Court reversed this Court's decision and ruled that Balentine pled facts sufficient to establish a *prima facie* cause of action in negligence based on acts that constituted the operation of the authority's vehicle, such that the Vehicle Liability Exception applied.

13

Relying on *Balentine*, the trial court in the instant case concluded:

In the case now before this [trial c]ourt, [the Podejkos] allege that they have set forth facts sufficient to establish a prima facie cause of action in negligence against [the Fire Department] based on acts that constitute the operation of a motor vehicle. It is undisputed that the [Fire Department] used fire trucks to draft and then expel water from Route [6] during the course of which the water made its way onto [the Podejkos'] [P]roperty. While this action may have caused [the Podejkos'] [P]roperty to overflow with water and flood, this does not fall within the [V]ehicle [L]iability [E]xceptions to governmental immunity.

A close review of the *Balentine* decision shows that while 'operation' is not just strictly 'to be in motion[,]'[] it does require 'a series of decisions and actions, taken together, which transport the individual from one place to another.' *Id*. For instance, in the instant matter, pumping the water from one area to another does not require any decisions in transporting an individual from one place to another. If the water pumping was done manually without the use of the [Pumper Truck], it would blatantly fall outside of the immunity exceptions. To say that just because the hose was connected to the [Pumper Truck] it qualifies as an operation of a motor vehicle would be a gross deviation to what the General Assembly meant in drafting the statute. Therefore, [the Fire Department's] [Motion] must be granted and the action against [it] must be dismissed due to [its] governmental immunity.

Trial Ct. Op. at 6.

Here, the Fire Department's firefighters transported themselves to Route 6 in the Pumper Truck and parked the Pumper Truck in the roadway where it would most efficiently remove the floodwater. However, pursuant to *Balentine*, the transporting of the firefighters to Route 6 and the proper parking of the Pumper Truck on Route 6 did not end the Fire Department's *operation* of the Pumper Truck.[10] The

---

[10] Before *Balentine* overruled *Love*, making a vehicle's *purpose* part of the analysis, this Court relied on *Love* to hold:

firefighters also activated the part of the Pumper Truck's system that removed the water from Route 6, and directed the water into the Plaza drains.

The Podejkos contend:

> The trial court's interpretation focuses on language from the *Warrick* dissent regarding transportation, which was appropriate in that case because it involved a SEPTA bus, whose primary purpose was to transport individuals from one place to another. The trial court's interpretation ignores, however, other language from the *Warrick* dissent indicating that the court must take into account the purpose for which the vehicle is operated. A primary purpose of fire trucks is to draft and discharge water. As such, fire trucks are 'in operation' when drafting and discharging water, as the [Pumper Trucks] were in this case.

Podejko Br. at 15-16.

The Podejkos are correct. The trial court's interpretation that the Pumper Truck's *operation* is limited to "decisions [related to] transporting an individual from one place to another," Trial Ct. Op. at 6, is too narrow in this particular case. Based upon *Balentine*, the courts cannot ignore "the purpose for which the vehicle is operated[.]" *Warrick*, 739 A.2d at 128 (Newman, J., dissenting). Here, the purpose of the Fire Department's Pumper Truck was not only to transport firefighters to where they were needed, but its parts were also expressly designed to

---

> In the present case, at the time the hose burst, the two fire trucks were stopped, were being used to pump water to the fire, and were clearly not being 'operated[],['] as defined by the Supreme Court in *Love*.

> Further, none of the acts involved via use of the attached hose was even remotely connected to driving or movement of the fire trucks. When [the plaintiff] was injured, both fire trucks were in stationary positions and were being used as pumping stations to extinguish the fire. Any acts associated with use of the hose are ancillary to operation of either vehicle and are insufficient to justify penetrating the cloak of immunity afforded to governmental agencies under the [Tort Claims Act].

*Speece v. Borough of N. Braddock*, 604 A.2d 760, 762-63 (Pa. Cmwlth. 1992).

disperse water onto fires or, in this case, to remove flood waters. Because the Fire Department controlled the parts of the Pumper Truck that removed the water from Route 6 and redirected it from the Pumper Truck's rear, the Fire Department *operated* the vehicle.[11] Thus, the Vehicle Liability Exception to governmental immunity applies herein if the Podejkos can prove that the Fire Department was negligent and that negligence was the proximate cause of the damages to their Property. *See* 42

---

[11] The Dissent declares that "special consideration must be given in cases involving a government's emergency services because the purpose of emergency response vehicles goes beyond transportation." *Podejko v. The White Mills Fire Dep't*, ___ A.3d. ___, ___ (Pa. Cmwlth. No. 714 C.D. 2019, filed July 27, 2020) (McCullough J., dissenting), slip op. at 2. Thus, the Dissent would have this Court interpret emergency vehicle operations differently than operations of other vehicles when they are not being operated on a public highway, such that fire and ambulance companies would be immune from liability for damages caused by the operation of emergency vehicle attachments. However, neither the General Assembly nor the courts have heretofore treated emergency vehicles differently. Although the Supreme Court in *Regester v. City of Chester*, 797 A.2d 898 (Pa. 2002), and this Court in *Speece*, reflected on the public duties of the vehicle operators, neither Court went so far as to recognize a separate or additional public ambulance/firefighting duty analysis. Moreover, both *Regester* and *Speece* were decided before the *Balentine* Court overruled *Love*. Notably, Justice Newman dissented in *Regester* on the same basis she did in *Warrick* (i.e., purpose and continuum of activity) and, based thereon, concluded that she would have considered the ambulance driver's failure to follow directions to the victim's home part of the operation of the ambulance. Because the *Balentine* Court adopted Justice Newman's *Warrick* rationale, it is not clear that *Regester* and *Speece* would support the Dissent's proposed post-*Balentine* interpretation.

The Dissent further suggests that this Court applied a public firefighting duties analysis in *Wilson v. Dravosburg Volunteer Fire Department No. 1*, 516 A.2d 100 (Pa. Cmwlth. 1986), and *Weaver v. Union City*, 518 A.2d 7 (Pa. Cmwlth. 1986), in reaching its conclusions. However, neither the Vehicle Liability Exception nor *operation* of the fire truck was at issue (or even discussed) in *Wilson* or *Weaver*. Rather, the issue in *Wilson* was whether a volunteer fire company was a government unit, and the issue in *Weaver* was whether the city's firefighting training exercise was within the scope of its public firefighting duties.

Finally, the Dissent's rationale that "the purpose of emergency response vehicles goes beyond transportation[,]" *Podejko*, ___ A.3d. at ___, slip op. at 1, is precisely why the Majority reached its conclusion. Because the Pumper Truck's purpose goes beyond mere transportation of firefighters to include water pumping, the operation of the Pumper Truck's pumping apparatus ("attach[ed] thereto," 42 Pa.C.S. § 8542(b)(1),) was considered part of the Pumper Truck's operation.

Pa.C.S. § 8542(a)(2); *see also N. Sewickley Twp.* Accordingly, the trial court erred by granting the Motion.

Based on the foregoing, the trial court's order is reversed.

_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Howard Podejko, Myrtis Podejko    :
and Myrtis's Preschool and Creative    :
Learning Center,    :
                    Appellants    :
    :
            v.    :
    :
Department of Transportation of the    :
Commonwealth of Pennsylvania,    :
Texas Township, and The White Mills    :
Fire Department    :
    :
            v.    :
    :
Hertha M. Kastler, Executrix of The    :    No. 714 C.D. 2019
Estate of Joseph G. Bunnell    :

## O R D E R

AND NOW, this 27th day of July, 2020, the Wayne County Common Pleas Court's February 6, 2019 order is reversed.

_____
ANNE E. COVEY, Judge

Howard Podejko, Myrtis Podejko and : 
Myrtis's Preschool and Creative : 
Learning Center, : 
           Appellants : 
                  :   No.  714 C.D. 2019
          v. : 
                  :   Argued:  May 13, 2020
Department of Transportation of the : 
Commonwealth of Pennsylvania, : 
Texas Township, and The White Mills : 
Fire Department : 
                  : 
          v. : 
                  : 
Hertha M. Kastler, Executrix of The : 
Estate of Joseph G. Bunnell : 


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE J. ANDREW CROMPTON, Judge


DISSENTING OPINION
BY JUDGE McCULLOUGH                       FILED:  July 27, 2020


        I must respectfully dissent from the Majority's conclusion that the Fire Department is liable for damages caused by the alleged negligent operation of its mini pumper truck to pump water off of Route 6, for two reasons.  First, I do not agree that the Podejkos' cause of action falls within the motor vehicle exception to governmental immunity, 42 Pa.C.S. §8542(b)(1), because the conduct is more closely associated with the public function served by the Fire Department than with

the physical operation of the vehicle itself as a means of transportation. I find it inconceivable that the legislature or our Supreme Court intended to impose liability on a volunteer fire department that is performing public firefighting/emergency duties simply because the negligence involves the operation of mobilized firefighting/emergency response equipment. Second, applying the construct of "operation" of a vehicle in the recent Supreme Court opinion in *Balentine v. Chester Water Authority*, 191 A.3d 799 (Pa. 2018), and other relevant precedent, underscores the conclusion that the use of the water pump here does not fit within the ambit of such precedent.

In my view, special consideration must be given in cases involving a government's emergency services because the purpose of emergency response vehicles goes beyond transportation. More often than not, emergency vehicles themselves are the very instruments of emergency response. Ambulances, firetrucks, and police cars are automotive vehicles equipped with specialized tools, such as the firefighting equipment at issue here. If we construe such mobilized emergency equipment as "attachments" that would extend the vehicle liability exception to include acts of negligence committed while operating such equipment, then fire departments would be subject to liability for any negligent act committed while putting out a fire with a fire hose - simply because the hose was transported to the scene on a firetruck. This is a consequence in tension with both the purpose of the governmental immunity that local emergency responders were meant to enjoy, and with the rule of strict construction that our courts must apply to the statutory exceptions to that immunity. *See Metro. Edison Co. v. City of Reading*, 162 A.3d 414, 421 (Pa. 2017) ("[W]e must narrowly construe and strictly interpret the exceptions in section 8542.").

In fact, our Supreme Court in *Regester v. City of Chester*, 797 A.2d 898 (Pa. 2002), has already rejected a plaintiff's attempt to invoke the vehicle liability exception when the conduct at issue was more closely associated with the emergency public service involved than it was with the physical operation of the vehicle. In *Regester*, the husband of the plaintiff suffered cardiac arrest. Members of his family called the local emergency services number, requested an ambulance, indicated a correct street number, and provided accurate driving directions. Emergency medical personnel traveled to an incorrect address, thus delaying their arrival at the correct location. When they arrived at the correct location, the emergency medical personnel were unable to revive Regester.

The Supreme Court held that the vehicle liability exception to immunity did not apply because the Regesters' allegations of negligence related not to the "operation" of the ambulance involved, but rather to other acts of negligence, *i.e.*, negligently failing to follow the correct directions given by the 911 dispatcher to the Regesters' house. The Supreme Court explained that the form of negligence alleged by the Regesters (failure to maintain adequate familiarity with the emergency service area and follow provided directions) was "**more closely associated with the public service involved (ambulance service) than it was with the physical operation of the vehicle as such**." *Id.* at 904 (emphasis added). In other words, the conduct was not the type of conduct that will implicate the vehicle liability exception.

Similarly, in *Speece v. Borough of North Braddock*, 604 A.2d 760 (Pa. Cmwlth. 1992), the plaintiff filed suit after being injured when a hose attached to two fire trucks burst at the scene of a fire. The plaintiff maintained that, as an attachment to a motor vehicle, a hose is part of the vehicle itself, and thus, negligent operation of the hose afforded a cause of action against the fire company. In addition to the "operation of an attachment" theory, the plaintiff also argued that the act of

PAM - 3

pumping water through fire trucks, in conjunction with operation of the attached hose, represented "operation" of the fire truck itself for purposes of the vehicle liability exception. Thus, the plaintiff asserted that not only was the attachment being operated, the fire truck itself was also being operated.

This Court disagreed. First, we held that, at the time the hose burst, the two fire trucks were "stopped" and therefore they were not being "operated," as defined by the Supreme Court in *Love v. City of Philadelphia*, 543 A.2d 531 (Pa. 1988). However, entirely separate from any reliance on *Love*, we relied on the fact that at the time the plaintiff was injured, the fire trucks "**were being used as pumping stations to extinguish the fire**." *Speece*, 604 A.2d at 762-63 (emphasis added). Thus, we held that any acts associated with use of the hose were ancillary to the operation of either vehicle and were insufficient to justify penetrating the cloak of immunity afforded to governmental agencies. *Id.* I do not agree with the Majority that *Balentine*'s overruling of *Love* has any impact on this part of *Speece*.

*Regester* and *Speece* are entirely consistent with established case law holding that a volunteer fire company has immunity when it is performing public firefighting duties. If the water pumping was done manually, without the use of the mini pumper truck, there would be no question that it would fall outside of the immunity exceptions. A volunteer fire department is no less eligible for immunity merely because the alleged negligent conduct somehow tangentially includes a vehicle. *See Wilson v. Dravosburg Volunteer Fire Department No. 1*, 516 A.2d 100 (Pa. Cmwlth. 1986) (applying the public firefighting duties analysis and holding that a volunteer fire company had immunity from liability for pollution, which the fire company caused when chemicals that it was using to clean up a diesel fuel spill on a highway polluted a lake); *Weaver v. Union City*, 518 A.2d 7 (Pa. Cmwlth. 1986) (granting immunity to a volunteer fire company for property damages which

occurred during a fire set by the volunteer fire department during a firefighting training exercise because the training exercise was within the scope of the volunteer fire company's public firefighting duties).

Obviously, a volunteer fire department is subject to the same liability with respect to the operation of its firetrucks as applies to other motor vehicles while being operated upon a public highway. *See Radobersky v. Imperial Volunteer Fire Department*, 81 A.2d 865, 867 (Pa. 1951) (holding that a volunteer fire company has immunity while engaging in the prevention and control and extinguishment of fires, but such immunity did not shield the fire company while it was returning from participation in a parade and that, in such instance, the company was subject to the same liability with respect to its fire truck as applies to other motor vehicles while being operated upon a public highway). However, that is not the case here.

Here, when the Podejkos' day care center was flooded, the mini pumper truck was being used as a pumping station to pump flood waters off of Route 6. Applying the above rationale, I would hold that the act of pumping water from a public roadway is "more closely associated with the public service" of firefighting than it is "with the physical operation of the vehicle as such." *Regester*, 797 A.2d at 904. The Fire Department must be granted immunity because it was engaged in the act of remedying a hazardous condition at the time it pumped water over the embankment.

By applying the vehicle liability exception to this case, the Majority has effectively extinguished the legislature's grant of immunity to volunteer fire companies for alleged negligent acts committed in the performance of their public firefighting/emergency service duties any time a volunteer fire department uses a firetruck. As a result, there will be no government immunity for a political subdivision's or local agency's emergency service providers any time they use a

specialized vehicle. I submit that this is the **<u>exact opposite</u>** of what the legislature intended.

The Pennsylvania Supreme Court instructs the "clear intent" of the Tort Claims Act is to insulate local agencies and political subdivisions from exposure to tort liability and strictly construes exceptions to immunity. *Lockwood v. City of Pittsburgh*, 751 A.2d 1136, 1139 (Pa. 2000). The Majority fails to adhere to this precept, and instead goes out of its way to fit this fact pattern into the exception. In so doing, the Majority engages in a broad "in operation" analysis. This approach will eventually lead to a *de facto* abrogation of the immunity granted to government emergency service providers because police, fire, emergency medical services, and animal care and control all use their vehicles to carry out their emergency service duties. Under the Majority's reasoning, it is difficult to imagine a situation where an emergency vehicle will not be considered to be "in operation." As a result, the exception will swallow the rule.

I also disagree with the Majority's conclusion that *Balentine* requires that we find the mini pumper truck was "in operation." *Balentine* involved a driver's decision to leave a vehicle parked partly on a highway. The *Balentine* Court clarified that a vehicle need not be "in motion" in order for the vehicle liability exception to apply. That case did not involve an emergency services vehicle, and did not overrule, let alone consider, that a volunteer fire company has immunity when it is performing public firefighting/emergency service duties. Rather, *Balentine* addresses the scope of liability when engaged in "operation" of a vehicle relating to compliance with or violation of safety and highway traffic laws.

By misreading *Balentine*, and expanding the vehicle liability exception to include the operation of specially equipped vehicles designed to fight fires and pump water, the Majority has moved away from what is supposed to be a narrow

vehicle liability exception, to capture conduct which was indisputably within the Fire Department's firefighting/emergency services duties. This cannot be what the legislature intended when it enacted the Tort Claims Act and the exceptions.

Mishaps involving emergency service vehicles warrant a special analysis which must start with a threshold question of whether the alleged negligent conduct at issue was performed while the emergency service provider was engaged in the performance of emergency services. The question is whether the vehicle is being used as a mode of transportation, in which case liability may lie, or whether it instead is being used solely in its function as a tool of emergency response, in which case the injury is not attributable to the "operation of [a] motor vehicle." 42 Pa.C.S. §8542(b)(1). Here, the injury occurred while the firetruck was being used as a pumping station, not during the firetruck's operation as a motor vehicle.

In sum, I believe that the Majority incorrectly construes the exception so broadly so as to find liability even when a government's emergency service provider is engaged in the performance of its public function - which is exactly what the legislature's grant of immunity was intended to avoid.

For the above reasons, I respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge

Judge Ceisler joins this dissent.